We'll now move to our second case of the morning, Speech First v. Killeen. This is Michael Connolly for Plaintiff Appellant, Speech First. The Sixth Circuit got it exactly right when it recently held that Speech First had standing to challenge the University of Illinois's student expression that others find to be biased. Like the University of Michigan, the University of Illinois here has created an elaborate scheme that discourages students from engaging in expression that others believe is biased. There is no question that a college student of ordinary firmness will have his speech chilled when a university official from the Bias Assessment and Response Team contacts him to tell him that he has been accused of engaging in biased expression and that they would like to speak with him about it. The district court's holding to the contrary was incorrect. If affirmed, it would create a circuit split with the Sixth Circuit and this court should reverse. Mr. Connolly, are there material differences between the Michigan program and the Illinois program? Not that I'm aware of. They both define bias-motivated incident. They both set up a Bias Assessment and Response Team. Michigan called it a Bias Response Team. They both collected reports of bias anonymously through a website. They both will reach out to students to talk to them. They both logged their responses and the complaints online. They both have the power to refer complaints to OSCR, which is something the Sixth Circuit found very important. So these two Bias Response Teams are nearly identical and for the same reasons that the Sixth Circuit found that Speech First had standing to challenge them. Is there any evidence in the record to support what I think you just said that the BART reports are referred to the university police? So there's a distinction that the university appears to be drawing about whether they refer reports to the police. There's a declaration... I think they have said they affirmatively don't refer them to the police. That's correct. My question to you is, did you put in any evidence to the contrary? Because this is a preliminary injunction hearing. The court weighed the evidence before. The court made factual findings that we review for clear air. Did you put in any evidence to support your allegation that the BART reports are referred to the university police? Yes, and there are two examples in the record. One is on page 258 of the Joint Appendix and the other is on page 198 of the Joint Appendix. And what happens is the BART releases an annual report every year where they describe reports they received and how they responded. The first one is BART consulted with police about an offensive Facebook page and the police worked to try to identify those responsible. The second one was, again, BART reported emails it had received to the police. So these were both examples of BART working with the police. And I believe the distinction that the university appears to be drawing is that BART may provide information to the police or contact the police, but BART will not formally refer cases to the police. And if that's the distinction they're drawing, it appears to me to be a distinction really without a difference here when it comes to the fear that, again, a student of ordinary firmness will fear from the biased response team. So in this Oscar office, there is a law enforcement officer who's assigned. Is that correct? On BART, there is a law enforcement officer. Does the record reveal or have any indication with regard to whether that law enforcement officer was involved in, for example, either of the references you talk about or any other interaction with individuals making complaints? It is not clear from the record whether the police that were involved with the BART responding to these incidents was that actual police officer on BART. That is not clear. But it is clear that on the 10-person team of BART is a police officer and that the two people who are in charge of BART are also on OSCR, which is the university body that is in charge of enforcing the student code. I don't see on page 198 what supports what you're saying. You don't have to look at it now. But before you come back on rebuttal, maybe you could specifically identify that. And then my next question for you is did you identify either of these incidents that you just pointed out to us to the district court during the preliminary injunction hearing? I'm not sure whether we identified these specific ones. We certainly identified how the BART works, that the BART can refer things to OSCR and the police. No, my question was what evidence do you have that BART could refer incidents to the police? And you've identified page 198 and 258. My question is did you identify those examples to the district court during the preliminary injunction stage to the extent that they do support it? 198, I'm not sure on a quick read that that supports what you're saying. But you don't have to answer that now. You can look at that and address it on rebuttal. The joint appendix and make sure I provide you with the right page. Do you agree that the bias-motivated conduct alone that BART looks at is not alone a violation of the student code? That's correct. Okay, so you're not advocating and saying that that alone would violate the code? Correct. BART does not have the explicit power to punish for bias-motivated incidents. But as we know from cases like Bantam Books in this court's decision and Backpage, whether or not the government official has the explicit authority to punish is not the dispositive inquiry. Well, Backpage was really different, though, because Backpage involved the sheriff sending a letter on his official letterhead demanding action, condemning the activities, and reminding them of the liability that they may face alone. There's no such evidence here of that. Well, as far as the way, I mean, if you think of this as an analogy to what happens at the university, you know, true, it's not the sheriff, but it's a body from the university called the Bias Assessment and Response Team. And on the team, I mean, it's literally housed in the same office that punishes for violations of the student code. And the leaders of it are the head... But you've just admitted this is not a violation of the student code. Agreed. But just in Backpage, the same in Backpage, Sheriff Dart did not have the power to punish the credit card companies for... But a letter from the sheriff on his letterhead demanding action and reminding them of their own potential liability they may face. It's a little bit different than an email from an organization saying, do you want to talk to us about this? I think even you would concede that. I would say in the... But again, also, think about it, the... I think even you would concede that, that it's different. Certainly, one was coming from a sheriff and the other was coming from Bart, but this was going from a sheriff to sophisticated credit card companies. And they still, this court still found that that was sufficiently threatening. Because of the language that was in there and the context in which it was sent. That's true, but this is also going to, you know, student, 19-year-old students. And so I would say, it would be my view that an email from the official, from the bias assessment response team, talking to them about this and saying, you've been accused of bias and we want to speak with you, carries the same connotation that happened in Backpage. What statements did the students intend to make here that would fall within Bart's purview? What evidence do we have? Sure. So, first we have the definition of a bias-motivated incident. And that includes expression that is motivated by prejudice or hostility based on a whole number of characteristics, race, gender, nationality, that sort of thing. And what we know from what the students want to do is, first, students A and C want to advocate for tougher, they want to advocate against illegal immigration and they want to support building a border wall. But did they put anything in, and it's not coming directly from the students, which the district court appears to have discredited in part because it's hearsay coming from somebody who claims they spoke with anonymous students. Did they identify specifically what statements they're claiming were chilled because of Bart? I didn't see anything where those specific statements were identified. Yes. So, in the Neely Declaration, we identify the specific statements that they want to make. So, the one I just mentioned about the border wall, the second from student B saying she wants to advocate for policies that support the de-radicalization of Islam, and the fourth was from the student D who says he wants to question what he's told about LGBT issues. And from the record, we know that Bart regularly receives reports on these exact same issues. The border wall, whenever anyone's protesting about building a border wall, they always get response complaints to the Bart, and the Bart responds to it. There's a number of instances in the record that we cite. Same thing about gender identity. There was a point in the record where a student said that he believed gender identity was a matter of choice. And, of course, that's bias on the basis of sexual orientation and gender identity. And someone from Bart, someone reported that to Bart, and someone from Bart reached out to them. Same thing with the de-radicalization of Islam that student B wants to talk about. There was an incident in a class where a student said it was his opinion that most terrorists are Arabs. This is what he said. And he got a complaint about it to Bart, and Bart responded. And Bart also categorizes every year based on the bias. And if you look at these reports, there are numerous examples every year of incidents of bias that are deemed anti-Hispanic, anti-Islamic, anti-LGBT. And it's all – the university puts out all these statistics. And I would say there's a reason that the university did not make this argument below. And they didn't make it below because they know that this exact speech will be reported to the Bart, and Bart will respond. So on that point, I think the record is clear. You have lumped Bart and BIP together. BIP is the housing aspect. I didn't see anything in the Neely affidavit supporting your allegations on BIP. So there is not as much evidence in the record about BIP. I didn't see anything supporting allegations of chilling in connection with BIP. I know you have said that they're similar, but none of the students, for purposes of standing and injury and a preliminary injunction and your burden of proof, I didn't see anything in the affidavit from any of the students saying essentially what BIP is doing is chilling my speech, even secondhand statements. So my – I can double-check, but I believe it was student C lives in student housing and indicated that he was – his speech was being chilled because of the operation of the university's policies against bias-motivated incidents. And my understanding of how the BIP operates is that it's very similar to Bart, except it's isolated solely for people who are living in university housing. And so I think that is where the evidence would be. Mr. Connolly, can I share an impression with you and get the benefit of your reaction to it? Sure. So as I went through this, I thought you pled it just fine. Your client pled it just fine. And I thought what Nicole Neely submitted was fine to get this all kicked off. And then what you confronted on the motion for a preliminary injunction is a very complete and thorough and, I mean, pretty carefully done submission by the university, right? They came forward with a lot of different information. And at that point in my mind, I've got a bit of a Lujan concern, okay? And my concern is that at that moment in the litigation, the members, A, B, C, D, we don't see a declaration or an affidavit from them saying, look, this kind of rosy and idealistic picture that is painted in all these materials from the university emphatically does not reflect the reality on the ground. The reality in Champaign-Urbana, they could have alleged, because I think it's hand in glove with your theory, is very different than what we're seeing from the university's submissions. So just bear with me a second. I think you'll get what I mean. The cases that were coming to mind when I was reading this are like, I think what the students are saying is it's happening different. On the ground we feel differently. And I started to think about cases like, and I know it's in a totally different area, like Lukumi-Bamaloo, okay? Santa Fe Independent School District versus Doe. Hey, look, it may look fine facially, but it is very different on the ground. And it's that absence of evidence from the members that concerns me here. What's your response to that? So, I would say that the evidence that we have in the record is from the university's own statements, from public statements they put on the record of how BART operates and their declarations, which laid out exactly how BART operates. But we know, don't we, you'd agree with this, I think, for certain. We know from cases like this that it has to be particularized. It has to be direct. So, if there was an affidavit here from a student that said, look, I've read it all. I go to school here. I don't feel the way that the picture, I don't feel at all in keeping with the picture that they've painted. Maybe you get there. You may be there. But right now we have Nicole Neely. It's flying at a little bit higher of level of generality than that. That's the concern that I have. Sure. And the best response I can give is that we are challenging the policies. And from our standpoint, all we need to say is we have students who are afraid of speaking. Here is what they want to say. And these are the policies. And if you look at the policies, there's, I don't think that additional declarations necessarily would have added much. Because for example, with BART, it's obvious what's happening. They have, they have... Mr. Connolly, I'm going to jump in here for just a minute because you only have a few minutes left. You're absolutely right at a 12B6 stage and for a pleading stage that all you have to do is say that. But this is the preliminary injunction stage where you have to put forth evidence supporting this. And I think Judge Scudder's question, what I was trying to get at before, is what is your evidence from the students? Not just saying there's a looking at the face of this because we know from the university, they have put forth detailed affidavits saying how you are construing this doesn't happen. And here are our top people telling you how this process works. What's your evidence counting it? It's kind of akin to Lacumi. Look at where the church in Lacumi says, don't buy it. This is a bunch of nonsense that this is a facially neutral sanitation code. Sure. It's not what's happening. So here we have anonymous students not giving specifics through a general affidavit where the students aren't saying, Bart ended up getting this referred to the university police and somebody was pursued because of this and therefore I'm afraid to speak. We don't have that type of evidence. And it's one thing for you to say, which you started out by when you were responding to Judge Scudder's question, well, we have said X, Y, and Z. Again, that gets you past the 12B6 stage. But at the preliminary injunction stage that you're appealing, you have to put forth the evidence. So a few points. First, if you review the Sixth Circuit's decision speech versus Schlissel, we did the exact same thing. We put forth the exact same declaration and the Sixth Circuit found that it was enough to get us, at least for standing purposes, to get us past that. And then the second I would say is, again, these policies are clear and for the most part, they're not disputing many of the facts that were put forth by the university because they've admitted to them already. They've published online how the program works. And so, at a minimum, the very first issue the court is confronted with is whether we have standing to challenge this. Now, maybe those concerns would have more weight on the merits, I think. But for standing, there has to be a concrete and particularized injury. And in the First Amendment context, when you're claiming chilling of speech based on some policy, there has to be a credible threat of enforcement. And that's what your evidence isn't establishing. And again, the best point I can say is that for standing purposes, which is what the district court dismissed this on, I think we've clearly alleged it because we hear... Alleged. Maybe you have alleged. There's the problem. Again, you have to prove it for purposes of a preliminary injunction. For purposes of standing, I think we've proved it at this point because there's no dispute about what our students want to say. There's no dispute that their exact statements have been investigated or have been reported to BART and responded by BART. And so, for standing purposes, those two facts, I think, get us there. We'll have you close. We are going to bring you back for a brief rebuttal because we're going to ask you some questions. Thank you. Thank you. We'll next hear from Mr. Bava. Thank you, Your Honors. And may it please the Court, Ishaan Bava on behalf of Appellees University of Illinois. Your Honors, in rejecting speech first motion for a preliminary injunction, the District Court carefully reviewed the record before it. On the one hand, it looked at the one factual statement submitted by speech first, not from anyone in any way affiliated with the university, but a three-and-a-half-page declaration from the president of its national advocacy organization, including second and, in some cases, third-hand hearsay about what she understood life on campus to be. On the other hand, the Court looked at the voluminous evidence submitted by the university, numerous declarations and supporting exhibits containing not only the texts of the very policy speech first challenges, but the reality of life on campus, a reality in which almost 50,000 students vigorously and daily express their First Amendment rights, not merely on the subject speech first members claim they want to express on, but indeed with the very viewpoints they claim they are chilled by. On that record, and under the correct legal standard, the District Court was right in saying that speech first has come nowhere close to mating the burden for the extraordinary relief it seeks, and there was certainly no clear abuse of discretion. If I might, I'd like to discuss the Sixth Circuit's decision, which speech first puts a lot of weight on. For reasons I'll say in a minute, I think the Sixth Circuit was wrong, but even if this Court were to adopt the reasoning of the Sixth Circuit, I think we win, and here's why. The Sixth Circuit found that, at least in the case of the Michigan BART, there was the referral to a disciplinary authority as a means of coercing a student to come and meet with BART. Regardless of what the record was in the Sixth Circuit, there isn't a shred of evidence, indeed there's not even an allegation by speech first that anything like that has ever happened at the University of Illinois. Indeed, the record is to the contrary. In the January Boaten Declaration, the one example she gives of where a BART report was referred to the Office of Student Conduct is the situation in which, in that case, a based on views about Israel, and it led then to physical contact with the student, harassment leading to physical contact. That is an allegation of a student code violation, and speech first doesn't say that there's any problem in that circumstance with a referral. What speech first never alleged is that ever the University of Illinois has threatened a referral to coerce a meeting or to coerce some end of speech, and indeed, as January Boaten says, and this is on page 314, the majority of students who BART reaches out to, the students whose conduct is reported, either don't respond at all or decline the meeting. So there is no basis there to say that the students feel that they are being coerced. And when my friend from the other side says, what we've alleged here is that our students feel this way, I think, Judge St. Eve, your point is right. They need proof, and the standard here isn't a subjective one. It's not, do we have one individual who feels that way? What this court has said repeatedly in the First Amendment context is that what is required is an objective chill, and you look at that by the text of the policies, but equally importantly, you look at it by what do the students at the University of Illinois think. And again, I think not only is it their response to BART, but it's the reality of their speech on campus. In almost every category that my friend identifies, we have put evidence in the record that that exact speech occurs on campus. They say, for example, they want to discuss pro-life issues. There was a major, and we have it in the record here, a major display of pro-life support in the central university quad at the University of Illinois, no chill. They say they want to advocate strong border policies. We've put in the record, there was a whole exhibition, Build a Wall, on the campus. A group at the University of Illinois invited an ICE public relations individual to come and speak on campus, and the university provided free security to make sure that event could go off without interruption. Time and time again, they have three, four anonymous students in a three-page declaration, and we've put evidence in the record that that simply comes nowhere close to what life is like on campus. And their case law, Your Honor, doesn't show it either. Judge Sinead, I think you're exactly right. Of course there are situations when an authority without actual coercive power could nonetheless put so much pressure to suppress speech. Of course there are. Backpage is a great example. On the letterhead of the sheriff of Cook County, a letter that begins, I'm writing in my capacity as sheriff, asking you to, quote, cease and desist, citing the federal money laundering statute, and then saying, we're going to conduct a press conference tomorrow morning. Are you going to change your behavior, or should we suggest that you, Visa and MasterCard, are involved in child sex trafficking? Well, of course that's going to chill Visa and MasterCard's behavior. Similarly, Bantam Books, a canonical Supreme Court decision, they cite. In that situation, you have this committee on morality sending letters to booksellers saying, you should stop selling these books. Then they say, we will refer cases who don't to the attorney general, and police show up at the booksellers days after to make sure what follow-up action has been taken on the letter. We don't even have allegations of something like that, let alone anything close to proof that that's what occurs with Bart and Bitt. So I think, and you're completely correct, the word Bitt doesn't even appear in the Neely Declaration. So the notion that some hearsay in that case, reference to the fact that a student lives in student housing, when we have the affidavit from the dean of student life, student housing at the University of Illinois, explaining how Bitt works, and evidence of all of the expression that takes place within the student housing, I think, again, comes nowhere close. And here, they have to show, as this court has said on a preliminary injunction basis, enough facts to survive summary judgment. They need to show a genuine issue of fact. I would respectfully submit they haven't submitted any facts at all about the reality of life on campus. So I think that, for these reasons, they've come nowhere close. And the district court was absolutely right, carefully reviewing the record to make the determination. They've shown nothing, nothing to suggest that speech is chilled, neither by the text of the policies they challenge, or by the reality of life on campus. And again, that's a reality not only about the way students actually respond to Bart and Bitt, which is, many of them say, I don't want to meet at all, or I'm not even going to bother to respond to the email. And in the instances when they do, they have no proof at all that anybody has ever been told they can't speak. In fact, it's quite to the contrary. They're told, you're not in trouble. You can keep expressing these views if you want to, and many do. And they have no evidence that anyone's ever said, I'm too scared to express something because of the existence of Bart and Bitt. So again, these allegations alone are not only, I think, flatly disproved by the record, but under the case law, they cite Backpage, Okwedi, Levin, Bantam Books. They simply come nowhere close. Now, the other thing I'll say about the Sixth Circuit, for the reasons I've given, I think this case is distinguishable. Because even if you accept this rule from the Sixth Circuit, is it possible that somebody has been threatened with, really, an illegal referral? Because under university policy, you can't refer this speech. This speech is fully protected by the student code. It's fully protected by the First Amendment. But could you commit this sort of illegal referral and say, yes, you said something, it's fully protected, but I'm going to refer you anyway, unless you come in and meet with me for this administratively burdensome meeting, as Speech First says. If that's the standard, we win, because it's never happened. But I would also suggest that that isn't the way this court normally conducts First Amendment analyses. In Shermer v. Nagode, which we cite in our brief, this court says that when evaluating standing in a First Amendment facial challenge, what you don't do is look at a statute, in that case it was a public disturbance statute, and say, could somebody misread this statute? Apply a misreading, and does that give standing? And, indeed, in Shermer, the police had not only misread the statute, they'd arrested somebody under the statute. And this court said, no, clearly that was a patent misreading of the statute, so there isn't an objective reason to think in the future the police are going to do that. Is everyone in agreement? Has everyone agreed, and Mr. Conley can speak for himself on this, that this is all as applied? I'm sorry, facial? I think it is facial. They've put absolutely no evidence at all that it's – I mean, they're asking for an enjoining of the entire BART policy going forward. So I think, yes, it absolutely is facial. And, of course, they put in no evidence at all to suggest anything as regards to them individually. I mean, they may not – your point is they haven't done enough. I mean, Neely talks about four students and what they want to talk about. That's absolutely right, Your Honor. She certainly talks about it, but I think particularly at a preliminary injunction stage, you know, this hearsay, double hearsay, and I'm not suggesting it's actually technically inadmissible, but certainly the district court was right to look at the weight of it. That's certainly not enough in light of what the university has put in. And the other thing I'll say is I think Abbott v. Pastidi's, the Fourth Circuit case from 2018, is also very important in this exact context. You know, the Sixth Circuit doesn't cite Abbott, doesn't even mention Abbott. Candidly, I haven't reviewed all of the briefs in the Sixth Circuit. I don't know if anyone cited it to them, but we certainly have cited Abbott, and I think Abbott is extremely, extremely probative in this situation. In Abbott, you have a case where the court says a mandatory meeting by the university to ask somebody to come in to respond, to give their side of the story. That doesn't violate the First Amendment. Well, if that doesn't violate the First Amendment, here we have a voluntary meeting that most students don't even respond to or say, I don't want to attend. At the meeting, there's not even a suggestion of a full-blown investigation. That's the word from Abbott. It's simply a discussion. That certainly doesn't violate the First Amendment, and it's not only because of the text of the policies. Again, it's the reality of life on campus. It's the hundreds of pages we put in the record showing how students at the University of Illinois vigorously, fulsomely, and I think wonderfully express their First Amendment rights on all of these subjects. If the campus life is so anodyne, why is Bart needed? So here is why, Your Honor. Obviously, there are young students, some of whom there are incidents that upset them. I think the university, it's responsible for the university to provide some form of support. When I say that the campus life is wonderful, it's not because students are muzzled. It's because there's vigorous debate. Lots of things are being said. Pro-life display, pro-choice display, anti-war, pro-war. An 18-year-old student might be upset and think, I want to get some support. I want to talk about something that upset me. That doesn't mean that anyone's First Amendment rights are being in any way impinged upon. For that reason, Your Honor, I would say, I think speech first's notion of the First Amendment is a very cramped and bizarre one. It's one which basically says when someone says something you don't like, there are basically two responses. Either you scream at the top of your lungs against them, or you run away and say nothing. I think the First Amendment's exactly the opposite. The idea is you have reason to debate. You have one view and another view, and you debate. That's what happens. Not only we've cited the chancellor of the university saying that embodies the university's principles, but don't only believe the chancellor's statements. That's what happens on campus, and they have zero response to that. For these reasons, I think that BART is in no way impinging on a First Amendment right. Obviously, it doesn't tell anyone not to speak. Obviously, it doesn't put any penalty at all. Every single statement they want is not merely not a violation of the student code. It's protected by the student code, and they don't dispute that. In fact, on page 212 of the record, the BART website says most of what is reported to us doesn't violate the student code. So BART's saying that as well. The fact that they can claim chill from anonymous students without even specifying what they want to say, when we have evidence of exactly those things happening on campus, I think the district court was right. Now, even though it wasn't discussed by my friend, if I could just briefly say, I think certainly on the no-contact directives, again, they are engaging in both a patent misreading of what the policy actually is, and they are engaging in a complete misreading of what life is on campus. So the policy itself, which is on page 377 of the record, 4.06a very clearly lays out when a no-contact directive can be imposed. And these things are critical, right? As we say in the Justin Brown Declaration, these are used to stop violations of the student code, sexual assaults, violent incidents between students. On a campus with almost 50,000 students, it's important to secure student safety, and no-contact directives are very important for that. And that's what I found confusing in page 17 of Judge Bruce's decision. He says no-contact directives do not prevent parties from being present in the same public space. I'm whipsawing. Their NCDs are coming down to protect from sexual assault, but it doesn't prevent people from being in the same public space? So, Your Honor, it's an excellent question. I think the way NCDs, and of course this has nothing to do with First Amendment expression, but to clarify that very point, I think the idea is if you're in a large gathering, for example a graduation or there may be a very large public speech with a lot of people, you're allowed to sort of stay separate from each other in that circumstance. You're not meant to directly approach somebody else, but of course what you are allowed to do with a no-contact directive, and even the one Minnick example they cite, even Mr. Minnick recognizes, you're allowed to write and say whatever you want online, express whatever views you want. What you can't do is confront somebody else when there has been a finding by the university of a sexual threat or of perhaps an imminent violence. And the university isn't handcuffed as to basically say we can't impose a no-contact directive until two students actually have fought. I mean that would be bizarre. So if there's the evidence found by the university that's likely two students have had a long-running conflict and it's going to occur, that's the situation when it's imposed. And I think I can discuss if the court would like the one Minnick example, but the fact of the matter is if that's the only thing they can possibly suggest when the no-contact directive suppresses speech, I just think it shows how weak their evidence is on this. And then finally I will say, Your Honors, on the mootness question to the extent the court has any issues about that, here the university followed its formal procedures, the Committee on Conduct Governance, followed by the signature of the Chancellor. This is a policy they don't even allege was ever enforced before. And so I say that because when the court determines is the university genuine in its desire to get rid of this policy, the absence of any prior enforcement whatsoever, the use of formal policies, the fact that we've said we have no reason to think this will ever come back, we don't want to put this back, it was never enforced in the past. I think all of that goes to show that their challenge is moot, and I think under clear case law, but also frankly in the context of universities, the Beta Upsilon case from the 11th Circuit, and I would even say the very fact is the 6th Circuit identified in Schlissel, it's clear that this policy is moot and their challenge is unavailing. Are you talking there just about the 2-407 or all three? No, that's correct, Your Honor, the 2-407. I think they lose on standing on the other two, but on the 2-407 it's clearly moot. Were there plans to rescind 2-407 prior to the lawsuit? So, Your Honor, I want to be careful about not revealing sort of attorney-client privilege in this admittedly somewhat public space. I think that 2-407 was never enforced. I think that, as I will say this, I think there are certain elements in voluminous codes that may have gotten in years ago and people aren't always aware that they even exist, and I think the test isn't whether there was plans before, the test is is it genuine, and how do you know it's genuine? You know it's genuine because you go through formal procedures. The fact that there is no prior enforcement I think only shows that you're not in a situation where the university is trying to hide the ball here. You know, all the cases they cite, I think, for example, the Aladdin case, great example, where in that situation they had a policy, they got rid of it during litigation, and then they put it back again. So when the thing happens again, they say, well, this is exactly what you did the last time. You got rid of it during litigation, you put it back. There's no reason to even suggest the university would do that here. No history of prior enforcement. Absolutely no suggestion, and again, a statement from a state employee, the acting dean of students of the university, no intention to reinstate this. Combined with the fact you have the signature of the chancellor, a formal procedure's gone through. I think that is clearly the record that is caught repeatedly, and the Fairbusters City of Chicago case I think is instructive, where again, in the midst of litigation, in that case, the city got rid of a procedure. I think that's very instructive on Moutoners. So, Your Honor, in sum, I think when you look at the facts and you look at the law, what Speech First is trying to do here is an extraordinary expansion of First Amendment standing on a total paucity, lack of any record whatsoever. Here is a situation where you have four anonymous, alleged anonymous students in a three-page declaration from the president of an advocacy organization in Washington, D.C., containing secondhand hearsay about life on campus, and on the basis of that, in the face of voluminous evidence not only about the operation of BART, the policies that the university has, the text of those policies, and also the way students respond to BART. In response to that, I think what Speech First has introduced is nowhere close, and again, I think what it goes to is a complete misconception of what the First Amendment means, about the importance of lively, vigorous debate between viewpoints, and not this notion that the only thing that you can have is everyone screaming at the top of their lungs with nothing else. I just don't think that's the reality of the First Amendment. I don't think that's whatever the marketplace of ideas has ever meant, and it's not the reality of life on campus. For these reasons, Your Honor, and if there are no further questions, we'd ask that you affirm the district court's denial of Speech First preliminary injunction. Thank you. May we sit down? Thank you, Your Honor. Mr. Connolly, rebuttal. We'll give you two minutes. Just a few quick clean-up points. Your Honor, it is on page A198, the point about the police, or the example from the police. It's tucked there at the bottom, which is probably why you missed it. Second, Judge Brennan, you asked about, you know, why is the BART needed, and the point that the counsel gives is that BART is needed for counseling. And we have no intention of trying to prevent the university from helping people who are affected by hurtful speech. They have counseling right now. We're not trying to stop them from engaging in counseling of students. And I think you know that the BART is actually about targeting the speaker because they allow anonymous reports. In fact, most of these reports come in anonymously. And if that's the case, it's certainly not helping the listener who's affected by the speech. The third thing I would say is, again, the standing purpose, the standing point. I think it's whether or not we went on the merits is a separate issue, but whether we have standing, we've alleged our students want to engage in this speech. There is evidence that the BART regularly receives these exact types of speech and responds to them. And I think the question, just the simple question to ask yourself is, if a student received an email from the bias assessment and response team saying you've been accused of bias and we'd like to speak to you about, for example, something you said in class, is it more or less likely that a student of ordinary firmness is going to make that same statement in the future? And that's the whole point of this. The whole point of this is to tell students we are watching you and you better watch what you say. And that's a perfect point to remember, I think. And finally, with the Section 2-407, it's not quite accurate that the university never enforced this. They have a declaration said from Ms. Kurtz said she had never seen or heard of it being enforced from one university official. And as the speech first court in the Sixth Circuit found, that could just as easily be evidence that the student's speech was already being chilled because you usually don't violate clear student code. Thank you. Thank you, Mr. Connolly. Thank you, Mr. Bobbitt. The case will be taken under revisement.